May it please the Court, Matthew Rosendahl of Kelly Guzzo, PLC, on behalf of the Appellant Steve Kovachevich. Your Honors, in 1998, Congress passed the Homeowners Protection Act to address the substantial burden that private mortgage insurance premiums place on low and middle income Americans. Specifically, at the time of the Act's passage, Congress found that Americans were paying hundreds of millions of dollars in insurance premiums for private mortgage insurance that was no longer necessary or required. Congress enacted the HPA for three purposes. First, to allow for automatic termination, as well as optional cancellation, of private mortgage insurance upon the meeting of certain conditions. Two, to require the disclosure of certain information regarding homeowners' rights under the Act. And three, relevant to this appeal, to require the reimbursement of unearned premiums that constituted, as Congress said, a windfall to mortgage insurers. Specifically, this appeal addresses Section 4902 F.2, which requires mortgage insurers, quote, to not later than 30 days after notification by the servicer of termination or cancellation of private mortgage insurance under this chapter with respect to a provide any unearned premiums of that mortgager to the servicer of the subject mortgage, quote, for repayment in accordance with Paragraph 1. This appeal addresses the first clause of that provision. Specifically, the notification by the servicer of termination or cancellation of private mortgage insurance under this chapter. There are two competing interpretations before your honors. The first, urged by appellant, is that under this chapter refers to the qualifying termination and cancellation events. And specifically, permits or requires, excuse me, reimbursement in the event of voluntary cancellation under Section 4910 B. Appellee, on the other hand, argues that under this chapter refers to the notification, specifically the notification in Section 4904 of the mortgage servicer to the borrower regarding the termination of the private mortgage insurance. For three reasons, appellant's reading is the only logical reading. First, the plain language of the statute, which as your honors know is where we always begin the analysis. If you look at Subsection F.1, that requires servicers to reimburse for qualifying termination and cancellation events, quote, under this section. Whereas Subsection F.2 states that the cancellation or termination is, quote, under this chapter. Using parity of interpretation for two conjoining provisions, as this Court has done before, under this section and under this chapter refer to the qualifying termination and cancellation events in both provisions. On the other hand, if you were to reply under this chapter to the notification, to say that that's referring to the notification under Section 4904, there are several problems. First, Section 4904 discusses notification of the mortgage servicer to the borrower. It does not discuss notification being provided to the mortgage insurer, which is what the issue in Subsection F.2 is. Second, the timelines between Section 4904 and Section 4902F do not line up. That is under Section 4904, notification of termination must be provided within 30 days of the cancellation or termination. Under 4902F.2, the insurer is not required to reimburse until 30 days after, in Apelli's reading, 30 days after receiving that notification, which would be 60 days from the cancellation or termination. Well, Subsection F.1 requires the servicer to reimburse within 45 days of the termination or cancellation. So, it would be impossible for a servicer to abide by the Act if the notification is, in fact, the trigger of the mortgage insurer's reimbursement obligation. Instead, under this chapter, just as in Subsection F.1, must refer to the qualifying termination or cancellation events that trigger the reimbursement obligation of the insurer. And, as courts have held routinely, and as used within the Act itself, chapter refers to the entire Act. That is what the Supreme Court held in Lowrin, and it is what this Court has frequently held as well, including in Jones, where it said that words that are used the same way throughout an Act must be interpreted the same. Can I ask you a question? Because I do take your point about the switch from chapter or from section to chapter, and, indeed, I think it might be more natural on the defendant's reading if, I'm going to get this mixed up, if the chapter were actually said section, right? But, on your reading, shouldn't section under F.1 really be chapter? Like, why wouldn't Congress just have said chapter if what it meant in F.1 is you have this right to reimbursement if there's cancellation under this chapter, either under this kind of statutory termination or the voluntary termination? Why would they have used section? So, two reasons, Your Honor. First, the concern with mortgage premiums is the mortgage insurers are really the companies that are getting these premiums and holding on to them. The servicers are maybe holding on to a few, and there's privity of contract between the mortgage holder and the mortgagor, where the servicer is the agent of the mortgage holder. So, if the mortgage holder and the mortgagor agree to cancel PMI, as they did in this case, which would be the 4910B, the only other provision in the chapter that discusses cancellation or termination, then there's no privity of contract between the mortgagor and the mortgage insurer. So, that's where F.2 has to come in and fill in that gap. But still, Congress could have just used chapter. Like, there's no reason Congress couldn't have used chapter there. It wouldn't have caused any problems, would it have? No, Your Honor. I would submit that it would not have caused problems, but they chose to make that distinction, and that's, to me, the logical reason why. And because they made that distinction, obviously, that means the insurer must have a broader reimbursement obligation. And I think that's because of the remedial purpose of the Act. The Act is designed to prevent that windfall to the insurer. The statute doesn't seem to draw any distinction between refundable PMI and non-refundable. And here you have a contract that provides for non-refundable PMI. How does that fit into the analysis, the statutory analysis? Does it make any difference whether it's refundable or not? Your Honor, our position is that's an opposite to the analysis here. That is a decision that was made between the mortgage holder and servicer and the mortgage insurer, the appellee. Mr. Kovacevic had no choice in that matter. They decided to allocate risks the way they decided to. The Act and Congress were not involved in that business decision, and the Act is clear as it's And I will say, obviously, this does not come up as often because, one, I think a lot of insurers do the right thing and just give the money back. But two, in this case, Mr. Kovacevic had prepaid his premiums, and that often is not the case. So, obviously, when you're paying as you go, you can quickly cut off the premiums. This is a situation that, granted, does not come up often, and that's why we're at this point. So, you started your argument and your focus on the text by saying this case is all about that kind of first clause of F-2, but the district court thought it was really, not all about, but very much about the part at the end where the repayment under F-2 is in accordance with paragraph one. And it does seem to be a pretty natural reading of these two provisions that, you know, F-1 says when the borrower is entitled to this reimbursement, and F-2 kind of provides for the transfer of funds so that the reimbursement in F-1 can be made. Why is that not the natural reading of these two provisions together, the way the district court read them? So, two reasons, Your Honor. First, the rule of the last antecedent, in accordance with paragraph one, is modifying repayment. So, that is instructing that once the unearned premiums are transferred to the servicer, who's the one that has the contact with the mortgagor, it makes sense for that to be the case, then it states that the purpose of that, so that the servicer isn't just holding on to that money, it avoids the problem that Pelley raised in their response of the servicer just ending up with this windfall instead. Well, that's why this section says for repayment in accordance with paragraph one, which instructs that the repayment should be to the mortgagor as it is instructed under paragraph one. Why does it just say for repayment to the mortgagor? That is a choice that Congress made. I will admit, Your Honor, it's not as artfully written as it could be, but I believe that's how it was applied in other cases, where they've said in accordance with, it requires, it modifies the noun immediately before it. The repayment must be in accordance with paragraph one. And you're also running into the problem that the provision is very clear that the insurer must return all any, quote, any unearned premiums that it's in possession of. So if it's only the premiums related to triggering events under section 4902, then one, you have to read under this chapter out of the provision, and two, you're running into the expansive, the potentially reimbursement of any unearned premiums. Under this chapter, and in accordance with paragraph one, cannot coexist unless you read it as under this chapter referring to the qualifying cancellation and termination events, and then in accordance with paragraph one as denoting the purpose of the repayment. And, Your Honor, it also makes sense when the remedial purposes of the act. This is an act that was designed to be remedial and designed to prevent unjust windfalls to mortgage insurers, so that our reading allows for people like Mr. Kravichevich, who don't have a choice in this matter, who are paying these premiums, paying them up front even, it allows them to get their just deserves. Can I ask you just a question about, kind of related to that, about the practical import of all of this. So, you've already explained, right, that most people don't prepay these fees, so this issue just isn't going to arise. Whenever there is cancellation, whether it's statutory or voluntary, there will be no unearned premiums because they'll just stop coming, right? For mortgagors who do prepay and then they get an early cancellation, are we talking now just about a delay in recovery? Like, on the defendant's reading, or on the district court's reading, would it mean that your client would never be able to recover those fees or would it be that he'll have to wait until he hits the point of statutory cancellation and then he can get them? See what I'm saying? Yes, so, Your Honor, that's where we run into the issue because he's now voluntarily So, 4910B says even before cancellation or termination date, you can voluntarily agree to cancel PMI. That's what occurred here. So, he stopped getting PMI. His mortgage holder isn't getting any benefit from that. There's no purpose to the insurance. So, there's no cancellation or termination date that's applicable now because he's cancelled the PMI completely. It's already over. So, this is how F2 accounts for that. It says, well, in these events where, if you're doing voluntary cancellation by agreement, which is the only other provision of the act that could possibly be under this chapter, then there's privity of contract between the mortgage holder, who's the principal of the mortgage servicer, and therefore can bind the servicer. But there's no privity of contract between the mortgagor and the mortgage insurer. So, that's where F2 comes in and says, well, insurer, you also need to do this because otherwise there's no... Because your briefs said, and this is what made me think of this, that under the district court's reading, borrowers like your client are out of luck as the insurers have no obligation to return the premiums already paid unless they wait for the cancellation or termination date to arrive years in the future. So, that's what made me think you were suggesting that... Oh, yes. I apologize for that, Your Honor. So, that's saying that they have no incentive to do the early cancellation. They're just going to have to wait. I see. There just won't be an early cancellation. Yeah. They're just going to have to then continue paying premiums or continuing receiving this insurance that due to the rise in value of their home or improvements that have been made, and this is becoming more common these days because of the post-COVID surge in home prices, that there's no incentive or ability really for them to get anything out of the voluntary agreement, even though it's indisputably not necessary anymore. So, that's why they would have to wait, essentially. I did not mean to suggest that the act requires them to wait. Thank you. Understood. So, for those reasons, Your Honor, we would say that the plain language of the act, the remedial purpose, and then the practical realities of the privity of contract between mortgagers and mortgage holders all lead to the only logical conclusion, which is that under this chapter refers to the qualifying cancellation and termination events, and the only other provision of the chapter that refers to cancellation or termination is 4910B, which is voluntary cancellation or termination by agreement, which is what occurred here and was alleged below, and therefore, the district court erred in dismissing Mr. Kovacevic's claims. If there's nothing further, I will yield my time. Thank you, Mr. Rosendahl. Mr. Farley? Good morning, Your Honors. May it please the court, Joseph Froelich for National Mortgage Insurance Corporation, and with me is my colleague, Greg Casamento, who's also on the briefs. Since the enactment of the HPA about 30 years ago, NMI, my client, and other mortgage insurers have worked cooperatively with lenders to provide refunds of mortgage insurance premiums when those refunds are required under the HPA. In the HPA, the Congress set forth a clear set of criteria for when a mortgage insurer is required to provide a refund of premium to a servicer on a mortgage insurance policy. The criteria appears in sections 4901 and 4902. You have to look at both 4901, which is the definitions, and 4902, and requires the following. The loan to original value has to be at least or below 80 percent. There must be a written request to cancel. The borrower has to have a good payment history. The borrower must be current on their payments. The borrower must show that the value of the property is not declined below the original value, and that there's no subordinate lien. When those criteria are met, the HPA is satisfied, and a refund of premium is paid from the mortgage insurer to the servicer. Section 4902 also instructs then the servicer to pay the premium back to the borrower. So there's sort of a two-step process that Congress had to recognize, as Mr. Rosenthal said, because there is not privity of contract between the mortgage insurer and the borrower. The limited number of claims and decisions on the HPA, and I think you would agree with that, their 30-year history of this statute, there are not a lot of claims, there are not a lot of cases. This is not like the TCPA or the FDCPA or other consumer statutes I've dealt with where there's probably thousands of claims a year. We're talking about maybe a dozen in 30 years of the statute's existence. With these limited number of claims, it's evidence of the fact that the mortgage insurers, the lenders, and the borrowers understand when the HPA requires a refund of premium to a borrower, and in those cases, the refunds are made. My client has been operating like that and under these rules since they came into existence. They actually are not, Mr. Rosenthal talks about the industry needing to be reset and to be fixed. My client didn't exist at the time the statute was created. So they've always existed in the world of the HPA and they follow the HPA. We're talking about millions of loans since the HPA was passed. Undoubtedly, the HPA is a remedial statute for borrowers that was passed to fix circumstances that existed 30 years ago. And since that time, this dearth of cases and claims in the 30-year history shows that the industry follows the statute and they know the criteria. Those criteria are very clear to them. As an initial matter, it's important we've got to understand what PMI is. It's private The lender will typically seek PMI when a borrower does not make a down payment of at least 20% of the cost of the property because you need this credit enhancement is required. The lender wants that so they are able to sell the loan to the GSEs, Fannie and Freddie. PMA provides the protection if the borrower defaults and the lender has to foreclose and ultimately sell the property. If there is such a loss, the mortgage insurer pays the lender to cover the loss. The borrower never gets paid from a PMI policy. It's also important to recognize that the lender buys the PMI directly from the mortgage insurer. The mortgage insurer has no contact with the borrower. As appellant freely admits, there is no privity between the borrower and the mortgage insurer. The HPA recognizes this structure. Nowhere does the statute require the mortgage insurer to directly pay the borrower. But instead, the statute has criteria that when met, sets forth a specific procedure for the mortgage insurer to pay the unearned premium to the servicer. And then the servicer must pay the unearned premium to the borrower. In this case, because the appellant did not meet the criteria Congress set forth in the statute, the appellant asked the lower court and is now asking this court to craft the remedy for him by pulling together various sections of the HPA that no court in the approximately 30-year history of the HPA existence has ever required. Appellant simply cannot escape that the facts of this case do not meet the HPA's clear criteria to require a refund of premium by the mortgage insurer and therefore no refund was required from NMI. Appellant's patchwork attempts to tie together various sections of the statute, namely 4902 and 4910, to fit the facts of his argument to create a new liability for mortgage insurers, is simply not supported by the plain language of the HPA, nor has any other court ever adopted this interpretation. Counsel, in fairness, I guess this kind of what you're calling a patchwork approach where you look to other sections of the chapter, I mean, it does seem there is the word chapter in subsection in F2 and usually if Congress uses the word section, a term of art, in one subsection and then immediately follows that by switching to the word chapter, like that means something. So, I'm not sure that it's, that's just sort of saying, well, this is a patchwork approach. Well, I think, Your Honor, the fact that, yes, obviously the statute says section and chapter and it says what it says. First of all, I don't think the court has to accept that the distinction, they then want to point it right to 4910, right? But the problem is 4910, but take a look at 4910, Your Honor, and 4910 says it will end the requirement for mortgage insurance. It doesn't say it's ending the mortgage insurance, right? If you look then back at 4902 F2, that's ending the mortgage insurance, right? So, they don't necessarily line up and I think a more reasonable interpretation is to look at the fact, they go to the, in order to get rid of the in accordance with, they go to the law of the last antecedent and just to make a point on that, I think you look at the, they're looking at the last now and you have to look at the whole clause, right? But if you, again, look at the whole section where it says under this chapter, right? We submit that it refers back to 4904, the notice provision, because you're looking at, I think you have to read 4902 F2 and F1, you have to read them in coordination, right? So, they're coordinated both in the fact that where's the money coming from? The money is going to come from the mortgage, the mortgage insurer has to give the money to the servicer, then the servicer will give the money to the individual. You have to have that structure. The timelines fit up. One is 45 days, one is 30 days. There's a 15 day gap in there so that the money can go from one party to the other party. So, I think Judge Walker got it right, that you have to read these sections. You can't divorce these sections from each other. Yeah, I understand all of that, but I guess I'm just saying, if you're right, wouldn't this just be a lot easier if under F2 it said section, not chapter? Then this would all make sense. I think you're right, Your Honor. It would be easier if it said section, but I do think the distinction becomes important because I do think the reason why Congress was putting it that way is I do think you're looking back toward the notice. I think you're also looking back toward the definition. So, the cancellation date, that definition is within 4901 and that becomes important because that's one of the criteria. The cancellation date gets you to the 80% requirement. That's nowhere in 4902. It just says within the cancellation date. I believe District Judge Walker did get it right. While Kovacevic asserted that his loan current value was below 80%, Judge Walker correctly pointed out that the HPA, very specifically, says it's the original value is the benchmark, not the current value. So, Kovacevic's first argument to the District Court was that he was there because of the change in value of his property. What the court noted was you look to the original value. You can't change the language of the statute. Judge Walker then also rejected Kovacevic's secondary argument that he did not need to even meet the 80% requirement for a refund. Judge Walker held that such an interpretation of the HPA created an absurd result that the borrower, like Kovacevic, could end his PMI immediately after closing on his loan. Finally, Judge Walker rejected Kovacevic's tertiary argument, the one that he is submitting here, that 4910 of the HPA that allowed for agreements between the borrower and the lender to end the requirement for mortgage insurance would require a mortgage insurer, and Anthony not party to the agreement, to return premium to the servicer. Judge Walker correctly found that there was nothing in 4910 that would then require a mortgage insurer to refund premium, and that 4910 was solely serving as a savings clause, meaning it permitted the borrowers and the lenders to limit the need for mortgage insurance. Okay, but Mr. Felix, Judge Walker's holding doesn't preclude a determination that had the plaintiff met the 80% requirement, he would be entitled to proceed under the statute to get reimbursement, notwithstanding the fact that he had entered into a private agreement for termination prior to, do you see what I'm saying? Certainly, Your Honor, Judge Keenan, absolutely. If he would have gotten to the 80% threshold, NMI would have paid this claim, without a doubt, and that goes to your question about refundable and non-refundable. So he would still have a remedy under the statute if he had complied with the statute? Yes, so for example, in this case... So Judge Walker isn't saying if you go private agreement, you're done? No, no, not at all, not at all. And if you reach that point, you do have a remedy. I would also submit, Your Honor, that Mr. Kovacevic has a remedy in this case. If he has an agreement with the mortgage holder, the servicer, he can pursue that agreement and breach of that agreement. It just does not necessarily mean that that money is going to flow back from my client to the servicer. And to your point, Judge Keenan, if Mr. Kovacevic, in this case, instead of putting his money into a renovation of his house, had just paid down the principal, maybe he would have gotten to that 80% number, and then he would have received a refund. The HPA has very clear guidelines. It has a very clear roadmap, and my client follows the roadmap. When they get a request to cancel, they look at the percentage, they see if it's 80% or lower, and then they will provide the refund. It is a very effective statute, and in that sense, it is well-written because it has provided the guidelines that it needed to correct a problem that existed 30 years ago. Counsel, so the district court made all of those holdings that you listed out, and then the district court said, this seems contrary to the purpose of the statute. This doesn't really make any sense that a person who pays the PMI in advance and then has this agreement that the PMI is really no longer necessary can't get a refund, whereas if he had been paying month by month, he would get the refund. And that doesn't seem to make any sense. Do you agree with that part of the district court's holding, that this is contrary to the purpose of the statute? No, Judge. I would submit that the statute does what it's supposed to do. If you get to the 80%, you're there. Congress had to wrestle with many different inputs, and they came up with the clear rules and gave a clear ruling and clear understanding to the industry of when this occurred. In this case, if you, again, want to enter into an agreement with the mortgage holder wants to enter into that agreement, they are free to pursue the mortgage holder slash the servicer to enforce that agreement. At the end of the day, we look to the HPA, and you look to the clear guidelines, and as Judge Walker said, you can't rewrite the statute just to get, you can't just say this is a remedial statute, and lo and behold, that gets you to the point you wanted to get to. Judge Walker said, as you say, was, look, you can't rewrite the statute just to advance the purpose of the statute. But I guess I'm asking you to tell me what is the, whether you agree, is that where we are? Like, this is contrary to the obvious purpose of the statute, but this is the way Congress wrote it, so that's the way we're going to enforce it. Or whether you have an account for why Congress might have wanted this particular result. Because this guy prepaid, rather than paying on a monthly basis, he gets stuck holding the bag. I mean, I can't point you to anything in the statutory history, Your Honor, and neither can they. Any conceivable purpose that might have been served? This section, 4910, is discussed nowhere in any of the statutory history. There is no conversation of, well, if we get these agreements, we have to have a procedure in order to get the money back to the borrower, right? There's nowhere in the statute in the, there's disclosures, right? All sorts of disclosures. They never mention agreements there. All I'm asking, like, I really am asking for your input on this question, with which I have been wrestling. Does that just look like an oversight? Like Congress just kind of blanked on the fact that some people might pay in advance, and it's not that many people. That's a plausible account. Or was there some reason why Congress wanted people to be able to get a refund if there's a statutory termination, but not if there is a voluntary termination? Maybe there's a reason, and if there is, I would be delighted if you could share it with me. Judge, I haven't been able to find a reason in the statute. I mean, I have to admit that there's no case law on this issue, right? There's nothing but the very general idea that this is a remedial statute. Okay. And here's the roadmap that we've set for the industry to operate. What's the reason for the savings clause? The savings clause, I think, is there, Your Honor, so that they can enter into the private agreements. Now, the important point about that, too, Judge, is if the mortgage holder wants to enter into an agreement to stop the requirement for mortgage insurance, they're free to do that. But the mortgage holder may decide that it wants to continue the PMI. It may feel that it's still important, and they could pay that premium themselves. I don't need the money from Mr. Kovacevic. I just need the money in order to continue the premium. So, for example, a mortgage holder, a loan might get sold to someone who has no interest in selling these loans to the GSEs, and they may decide, you know what, I'm not going to require this borrower to have PMI. They would be free to cancel that requirement with the borrower, but it doesn't necessarily mean you cancel the mortgage insurance until – That's fine unless you have residual unearned premium, as you have here. Yes, certainly they could pay it and continue it, but it seems like Congress is saying it's to protect the consumer, the mortgage holder, people who buy homes and they're required to pay a premium which they won't benefit from. It's understandable because the way it works, you're paying less than 20 percent down, but here you have unearned premium, and it seems like 49 to 10, they put chapter there because they didn't want a cabinet just to that section. See what I mean, right? They left two, they said chapter deliberately. I would think though that if you were going to put within 49 to 10 requirements that the mortgage – you have to have a very set procedure again to get the money from the insurer to the servicer back to the borrower, and it's not the servicer or the insurer giving the money right back to the borrower. If they were going to make that part of the statute, they would have made that part of the statute. There would have been clear guidance to the mortgage insurance industry and my client to – when there is an agreement, they very easily could have said in the event of an agreement under 49 to 10, the mortgage insurer will return the money to the servicer. There's nowhere in that in the statute. But they really did give clear guidance perhaps, do the right thing. That's really what the guidance is, do the right thing and give back unearned premium. Judge, the one thing I would point to too is there really is no provision within this statute of what kind of notice my client would get if there is an agreement. So for example, if you look at the record in this case at the appendix at 43 to 45, there is the correspondence where my client was informed that the mortgage, Mr. Kovacevic is looking for a refund, right? And all we are told is that the mortgage insurance is canceled. My client then looks at the math and says, no, it doesn't fit. We're not told, hey, it's canceled because there's an agreement under 49 to 10 that you have to suddenly then comply with. We don't even know there's an agreement. We just know Mr. Kovacevic is looking to cancel the mortgage insurance. If there was such a requirement of an agreement, you think then there would be something in the notices where my client is supposed to be specifically told this is a cancellation by agreement under 49, 10. Oh, okay. So that's different. What about unjust enrichment? Is there a claim for unjust enrichment in a state cause of action? I don't think so, Your Honor. I think there are cases including the Hermanson case that we cited in our brief where claims for unjust enrichment, I believe, have been deemed to be preempted by the HPA. So I don't think that that claim would be a claim you would bring against the mortgage insurer. Basically, the appellant here is trying to establish a whole new system of liability. Again, it's been 30 years. Nowhere has there ever been a case where anyone has brought forward this concept that if there's an agreement, you suddenly have to, the mortgage insurer has to provide the refund back. There is a remedy for Mr. Kovacevic. He can bring a state court action claim against the servicer who says, we have an agreement. Great. They can pay that money back. Money is fungible. The money, the servicer is free to enter into those agreements. If the servicer or the mortgage holder wants to end the requirement for PMI, again, they're free to do so. But what the HPA does not allow is that the mortgage loan holder can recover premium from the mortgage insurer. It has been that way now for 30 years and the appellant provides no reason why we should change the law at this point. For this reason, we believe the court should deny the appellant's appeal and should affirm Judge Walker's order. Thank you, Mr. Perley. Mr. Rosenthal, you have a few minutes reserved. Thank you, Your Honor. I'll just address a few points from my learned colleague. First, he spends a lot of time talking about how NMI follows 4902 and this is not just about 4902 and cancellation or termination when you hit the 80% and so on. This is about Congress's choice of the words under this chapter in subsection F2. And the appellee cannot get around those words. The only way they can get around it is to try and say that that's referring to the notification. But there's no provision in the chapter that discusses notifications being provided from the servicer to the mortgage insurer. The only provision is 4904, but again, that is about notice to the mortgage or the borrower. And it is also the timelines would not add up. They would not work if you incorporated, if you said that under this chapter referred to notification in 4904. Instead, under this chapter has to refer to the qualifying termination and cancellation events. And the only other provision in the chapter that discusses that is voluntary agreements to terminate. Now the notification makes sense within F2, the fact that there must be notification because of course, as we've talked about, there's no privity between the insurer and the mortgagor. So of course, the servicer is the intermediary that needs to provide some sort of notice. Here, as appellee admits, there was notice. They were told that they had canceled the insurance and they requested a refund of the premiums. All that the appellee had to do at that point, as they admit, is do the math and figure out how more portion of the prepaid premiums should be returned to the mortgagor. That makes logical sense within the statute. It makes logical sense because of the purpose of the statute. The purpose of the statute is to prevent unjust windfalls. And to Judge Keenan's point about, well, if you don't have a right of action until the, under voluntary agreement, you can at least wait until the cancellation or termination date, the Act specifically contemplates that you can voluntarily agree to cancel PMI. And you should not, we should not require homeowners to wait for the cancellation or termination date, especially when the home values are increasing such that they're able to avoid the need for the PMI in the first place. We're not here to say that PMI is evil, that PMI is bad, but there are times that Congress has said that it becomes no longer necessary, including when the parties voluntarily agree to get rid of it. And when that happens, the HBA is designed to prevent any, the insurer or the servicer, from getting unjust windfalls from that decision. And that is why F-2 is crafted with the under this chapter language. This is to address a loophole in the fact that when a mortgage holder and a mortgagor agree to cancel PMI, yes, there is a contract. And yes, you can bring a suit against the mortgage holder, but the mortgage holder is not the one holding the premiums. It's the mortgage insurer. That's where F-2 comes in. That's where Congress has made a policy decision to say any unearned premiums, it could not have been more expansive, any unearned premiums in possession of the insurer must be returned to the servicer for repayment in accordance with paragraph one, which means for repayment to the mortgagor by the servicer. That is what the logical reading of the statute is. That is the loophole that F-2 is addressing versus F-1. And that is why appellant's reading is the only logical reading that meets both the plain language of the statute, its remedial purpose, and simply doing the right thing. Thank you, your honors. I appreciate your time today. Thank you, both counsel and for your presentations. We're going to ask the clerk to adjourn the court for until tomorrow morning. Then come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, Pamela A. Harris, Barbara Milano Keenan